## In The Matter of Jodie Grossman.

Suffolk. November 9, 2006. - January 2, 2007.

Present: Marshall, C.J., Greaney, Ireland, Cowin, Sosman, & Cordy, JJ.

*Attorney at Law,* Disciplinary proceeding, Suspension.

This court concluded that the substantial delay (eight years) between the filing of a grievance and the filing of a petition for discipline did not constitute a mitigating factor in the sanction of indefinite suspension imposed for the respondent attorney's misconduct (misappropriation of client funds with actual deprivation or intent to deprive, and submission of fabricated evidence to bar counsel), where the respondent failed to meet her burden of demonstrating substantial prejudice from the delayed investigation. [159-162]

Information filed in the Supreme Judicial Court for the county of Suffolk on July 14, 2005.

The case was heard by *Spina,* J.

*Joseph S. Berman* for the respondent.

*Susan A. Strauss Weisberg,* Assistant Bar Counsel.

Marshall, C.J. This bar discipline matter is here on appeal from an order of a single justice indefinitely suspending the respondent attorney, Jodie Grossman, from the practice of law. At issue is whether bar counsel's delay in the prosecution of the matter — some eight years — should be considered as a mitigating factor in the sanction imposed for the respondent's misconduct, misappropriation of client funds with actual deprivation or intent to deprive, and submission of fabricated evidence to bar counsel.

The respondent asks that we not impose the presumptive sanction for her misconduct, an indefinite suspension from the practice of law, *Matter of Schoepfer,* 426 Mass. 183, 187 (1997), in light of bar counsel's substantial delay in the prosecution of her case. To do so, however, would treat more leniently her otherwise serious ethical misconduct for reasons entirely divorced

from the gravity of the offenses. Bar counsel, in turn, asks us to impose the presumptive sanction even as he acknowledges that his investigation "took far too long" and he does not "excuse or justify the delay in bringing this matter to a conclusion." That resolution might suggest an indifference to the timely disposition of cases concerning bar discipline.

In *Matter of Gross*, 435 Mass. 445, 450-452 (2001), we determined that delay in the prosecution of attorney misconduct does not constitute a mitigating factor absent proof that the delay has substantially prejudiced the defense, or evidence of resulting public opprobrium. In this case, the respondent established neither. We therefore affirm the decision of the single justice, and impose the presumptive sanction of an indefinite suspension from the practice of law. We caution, however, that our decision today should not be read by bar counsel, members of the bar, or the public to condone in any respect the inordinate delay by bar counsel in this case.

1. *Background.* On May 6, 2002, bar counsel filed a petition for discipline against the respondent relating to conduct that had occurred some ten to twelve years earlier. A hearing committee of the Board of Bar Overseers (board) found commingling of funds, misuse of client funds, and conversion, and that the respondent had fabricated some of the evidence she provided to bar counsel during the investigation. In mitigation, the committee found that there had been "prejudicial delay" in the prosecution of the grievance by bar counsel, and recommended a sanction of suspension of one year and one day from the practice of law.

On appeal from the hearing committee's decision, the board agreed that the delay in prosecution should be considered in mitigation, but it recommended a four-year period of suspension — a term it considered to be a slight reduction from the presumptive sanction for the respondent's misconduct. After an information was filed in the county court, the single justice imposed a sanction of indefinite suspension from the practice of law, concluding that delay without a showing of substantial prejudice, which the respondent had not demonstrated, does not mitigate the presumptive sanction. This appeal followed.

2. *Facts.* The single justice concluded that the hearing com-

mittee's findings, subsequently adopted by the board, were supported by substantial evidence. See *Matter of Segal*, 430 Mass. 359, 364 (1999). On appeal the respondent does not challenge his conclusion, except as otherwise noted. We summarize those findings.

The respondent was admitted to the Massachusetts bar on December 18, 1980. Between early 1985 and the fall of 1989, she worked as a salaried employee of a multi-State law firm, Akman & Associates, whose principal was Bryan Akman. Although the firm closed its Massachusetts office in late 1989, the respondent remained on retainer until November, 1998. The facts giving rise to this appeal concern a matter referred to the respondent by Akman.

Manuel Raposa died on February 23, 1988, survived by his wife, Hortence Raposa (from whom he had been legally separated since about 1954), and three adult children, Kenneth Raposa, Sheila Botelho, and Madeline Escobar. Manuel[1] had had a long-standing relationship with Hortence's sister, Mary Gonsalves, apparently in whose name much of Manuel's property was jointly held. There was evidence that, before Manuel's death, he and Mary had become estranged, and Kenneth and Sheila believed he had made a will, that he was the sole owner of an apartment building, and that he had money in various bank accounts.

In February, 1988, Kenneth, the president and business manager of a union from which the Akman firm hoped to obtain legal work, and his sister Sheila contacted the firm regarding their father's estate. Because Manuel had resided in Massachusetts, Akman referred the matter to the respondent, and informed her that the estate matter would be handled without charge. The hearing committee credited Akman's testimony that he told the respondent not to charge for her services.[2] In late February or March, 1988, the respondent communicated with

---

[1] We use the first names of the Raposa family members to facilitate our recitation of the facts.

[2] The respondent does not contest that Bryan Akman agreed to represent Kenneth and Sheila without charge. She challenges, inferentially, the finding of the hearing committee crediting Akman's testimony that he informed the respondent of this arrangement. See note 7, *infra*.

both Kenneth and Sheila, who gave her three uncashed checks made payable to either Manuel or Kenneth, and the respondent told them that she would hold the funds in escrow.

In March, 1989, the respondent opened an interest-bearing passbook savings account for the estate, on which the respondent was the sole signatory, and deposited the three checks. One week later one of the checks (for $243) was returned due to a stop payment order, leaving a balance of $1,528. That spring, the respondent recommended that Akman hire a Massachusetts attorney, Andrew Levenson, to advise them about the estate issues, and Akman agreed to do so. In July, 1989, Levenson forwarded a report to the respondent, opining that, of the money held in escrow, $328 belonged to the estate, and the remainder belonged to the heirs. His report also opined that it would be difficult to proceed against Mary Gonsalves. The hearing committee credited the respondent's testimony that Kenneth and Sheila did not want the respondent to file voluntary or formal administration, and did not want the escrowed funds distributed, but wanted to continue to try to find the will and contest any efforts to distribute Manuel's assets to Mary.

In the fall of 1989, Kenneth and Sheila terminated the respondent's representation, and Akman instructed her to transfer the Raposa file to J. Drew Segadelli, which she did. Segadelli responded that he would take no action on the matter without a retainer. From October, 1989, to June, 1990, the matter was relatively inactive. In the spring of 1990, the respondent directed that a lost will notice be published in the Patriot Ledger newspaper. In June, 1990, Akman paid Segadelli's retainer, and thereafter, Segadelli represented Kenneth, Sheila, and Hortence.

In December, 1990, the respondent, "as trustee of the Estate of Manuel Raposa," withdrew $248.88 from the Raposa account by a bank check payable to the Patriot Ledger. The hearing committee credited the respondent's testimony that she mistakenly used the funds from the Raposa account to pay another client's bill, thinking that the bill was for the lost will notice. On or about December 19, 1990, however, the respondent withdrew $500 in cash from the Raposa account. The hearing committee did not credit her testimony that she "believed" she used the funds to pay Levenson's July, 1989, bill. The hearing

committee found that Akman told the respondent that the firm would pay the bill, that the respondent gave Akman the bill, that Akman paid the bill in July, 1989, and that he told the respondent it had been paid.

On or about March 9, 1992, the respondent withdrew an additional $500 from the Raposa account, by bank check payable to Bradley C. Pinta, an attorney. The hearing committee found that this was payment to Pinta for personal legal services for the respondent, unrelated to the Raposa estate. The hearing committee did not credit the respondent's testimony that she was entitled to the funds as her "fee" in the Raposa matter.

3. *The bar discipline grievance.* From early 1993 through early 1994, Segadelli repeatedly requested that the respondent forward to him the Raposa funds she was holding, ultimately communicating to her his intent to file a complaint with the board should she fail to do so. In January, 1994, Kenneth sent a letter to the respondent confirming that she had been discharged as his attorney in 1989, and directing her to forward the escrow funds to Segadelli. The respondent failed to do so. In February, 1994, Segadelli filed a grievance with the board.

In March, 1994, bar counsel sent the respondent a copy of Segadelli's grievance, and requested both a response and copies of all statements and deposit slips pertaining to the escrow account. The respondent replied in May, 1994, enclosing what she represented was a photocopy of the Raposa account passbook. The photocopy of the passbook did not indicate that any funds had been withdrawn. The hearing committee found that the respondent had "intentionally altered" the copy of the passbook and submitted it to bar counsel "knowing that it was false with the intent to conceal her intentional misappropriation of funds in the Raposa account for her own personal use."

Approximately four years later, in July, 1998, bar counsel contacted Segadelli and was advised that Segadelli had received no funds from the respondent. That same day, bar counsel requested from the respondent an accounting of all funds held on behalf of the Raposa estate, as well as further documentation concerning those funds. In late July, 1998, bar counsel served a subpoena duces tecum on the bank in which the escrow funds had been deposited. The hearing committee concluded that, on

receipt of the bank documents, bar counsel learned for the first time that the respondent had made withdrawals from the account. Thereafter, in August, 1998, the respondent furnished bar counsel with an accurate photocopy, and then the original, of the passbook. In September, 1998, the respondent deposited $1,784.04 in personal funds into the account. In October, 1998, she closed the account and remitted the account balance of $2,411.27 to Segadelli.[3] Four years later, on May 6, 2002, bar counsel filed a two-count petition for discipline against the respondent.[4]

We now turn to the proceedings before a hearing committee of the board, and those of the board itself.

4. *Recommendation of the hearing committee and the board.* As noted earlier, the hearing committee found that the respondent had commingled funds, misused her client's funds, and wrongfully converted funds. It also found that the respondent had fabricated some of the evidence she provided to bar counsel. It concluded that the respondent had violated S.J.C.

[3]Following the closure of the Massachusetts office of Akman & Associates in 1989, Akman continued his affiliation with the respondent on a retainer basis. In November, 1998, on learning of the conduct of which the respondent was later accused, Akman terminated his relationship with her. Specifically, Akman testified that he terminated the relationship when bar counsel telephoned him and asked about the underlying facts.

[4]The first count set forth essentially the facts recited above. The second count alleged that, from at least 1995 through 2000, the respondent maintained two Interest on Lawyer Trust Account (IOLTA) accounts over which she was the sole signatory. During that period, she made or authorized all deposits to, or withdrawals from, those accounts. On six occasions, she deposited funds that were not client or fiduciary funds and should not have been deposited in her IOLTA accounts. On another occasion, she failed to withdraw funds from a client's retainer after they had been earned. With respect to count two, the hearing committee found that, while the respondent failed to understand the IOLTA rules, there "was no evidence of any deprivation or personal benefit resulting from these violations." Because it found that the respondent's misconduct constituted a violation of the specific rules requiring safeguarding of client funds, it declined to find, as duplicative, that she had violated the more general rules proscribing conduct adversely reflecting on fitness to practice law, namely, Canon 1, DR 1-102 (A) (6), as appearing in 382 Mass. 769 (1981), and Mass. R. Prof. C. 8.4 (h), 426 Mass. 1429 (1998). The committee concluded that even if her conduct were deemed a violation of the latter rules, it would not alter its recommendation for the sanction, noting that this misconduct by the respondent, standing alone, would warrant at most an admonition.

Rule 3:07, Canon 1, DR 1-102 (A) (4), as appearing in 382 Mass. 769 (1981) (dishonesty, fraud, deceit, or misrepresentation); and S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (6), as appearing in 382 Mass. 769 (1981) (conduct adversely reflecting on fitness to practice law); S.J.C. Rule 3:07, Canon 9, DR 9-102 (A) and (B), as appearing in 419 Mass. 1303 (1995) (lawyer shall keep client funds separate from her funds, shall safeguard client property, and shall pay over client funds when due); and S.J.C. Rule 3:07, Canon 9, DR 9-102 (C), 419 Mass. 1306 (1995) (same). As to conduct occurring after the rule went into effect (January 1, 1998), the committee concluded that the respondent had violated Mass. R. Prof. C. 8.4 (c), 426 Mass. 1429 (1998) (dishonesty, fraud, deceit, or misrepresentation); and Mass. R. Prof. C. 8.4 (h), 426 Mass. 1429 (1998) (conduct adversely reflecting on fitness to practice law); and that the respondent had violated Mass. R. Prof. C. 1.15 (a) and (b), 426 Mass. 1363 (1998) (lawyer shall safeguard and keep separate client funds and shall notify client on receipt of funds), all of which related to her intentional misuse and conversion of the escrow funds or her subsequent concealment of her misconduct.

With respect to its recommendation for discipline, the hearing committee acknowledged that the presumptive sanction for misappropriation of client funds with intent to deprive or actual deprivation, as occurred in this case, is indefinite suspension or disbarment from the practice of law. *Matter of Schoepfer*, 426 Mass. 183 (1997).[5] The hearing committee nevertheless recommended a sanction of suspension for one year and one day, partly because of "the prejudicial delay" by bar counsel in instituting formal proceedings,[6] partly because the respondent had made full restitution, and partly because of the respondent's

[5]Bar counsel sought indefinite suspension, not disbarment. The hearing committee noted that restitution (or its absence) is a significant factor in determining between the two sanctions. *Matter of Bryan*, 411 Mass. 288, 292 (1991). The hearing committee also noted that sending bar counsel falsified bank records would warrant a public reprimand. *Matter of Provanzano*, 5 Mass. Att'y Discipline Rep. 300 (1987) (public censure where misconduct was presenting false evidence at hearing, and attorney previously received private reprimand for similar misconduct).

[6]The hearing committee found that, while the respondent's acts at issue occurred in the late 1980's and early 1990's, bar counsel had not filed a petition for discipline until 2002, four years after bar counsel had first been made

public service: the committee considered the respondent's long record of providing legal assistance to disabled individuals who would otherwise lack access to legal services.

On appeal, the board dismissed the respondent's objections to the hearing committee's factual findings as "wholly without merit." As the board viewed the case, absent the delay in the proceedings, the facts as found by the hearing committee constituted "a straightforward case of misuse of client funds, with deprivation resulting." Because of the "eventual" restitution, the board viewed the case as falling within that category of cases for which the presumptive sanction is indefinite suspension. *Matter of Schoepfer, supra.*

In the words of the board, however, bar counsel's delay in filing the petition for discipline raised a "difficult question." Noting that bar counsel had "made no attempt to explain or defend the apparently indefensible delay," the board stated that it was "faced with a record that lacks any justification for the eight-year interval between the original grievance and the filing of the petition for discipline." The board also noted that the hearing committee "did not identify any particular issues as to which the missing documents or faded memories might have assisted Respondent's defense,"[7] and it remained "somewhat skeptical that Respondent proved actual prejudice for the lapse of time between the events at issue and the disciplinary hearing." The board nevertheless concluded that it would "defer" to the judgment of the hearing committee "on this point." In light of the "very serious nature of the misconduct," however, the board determined that the substantial reduction in the hearing committee's recommended sanction was not warranted, and it recommended a sanction of a four-year suspension from the practice of law.

aware of the respondent's withdrawals from the escrow account.

[7]The hearing committee made reference to three instances of "faded" memories, none of which was germane to the misconduct found by the committee. As to "lost" documents, the respondent argues that Sheila Botelho's records, now destroyed, might have supported the claim that the respondent was entitled to withdraw funds from the escrow account as a fee for her services. However, the hearing committee heard detailed testimony from Bryan Akman, Kenneth Raposa, and Sheila Botelho to the effect that Akman had agreed not to charge any fee in this matter. The committee credited the testimony of those witnesses and not that of the respondent in this regard.

5. *Discussion.* The focus of both the respondent and bar counsel on appeal concerns the impact, if any, that the substantial delay between the filing of the grievance by Segadelli in February, 1994, and the filing of the petition for discipline in May, 2002, should have on the sanction to be imposed on the respondent. With respect to that question, the single justice correctly noted that "[t]he burden is on the respondent to show substantial prejudice from the delayed investigation. Delay alone is insufficient to mitigate the sanction." See *Matter of Gross*, 435 Mass. 445, 451-452 (2001); *Matter of Kerlinsky*, 406 Mass. 67, 75 (1989), cert. denied, 498 U.S. 1027 (1991). On examining the record, the single justice concluded that the respondent had failed to meet her burden, noting that she "never raised before the hearing committee the issue of lost documents or faded memories as to the two $500 withdrawals." The single justice also took into account that when bar counsel first asked for an accounting of the funds from the respondent in 1994, she provided falsified documents that purported to show that there had been no withdrawals from the account. It was only in 1998, when the accurate records of the account were produced by the bank, that the respondent first furnished bar counsel with the passbook itself, and bar counsel first learned of the withdrawals.

In *Matter of Gross, supra,* we recently reaffirmed that, absent proof of substantial prejudice to a respondent's defense, delay in bar counsel's prosecution of a disciplinary matter does not constitute grounds for mitigating the presumptive sanction. We agree with the single justice that, in this case, the respondent has not met her burden of demonstrating such prejudice, and that there is therefore no basis here to reduce the presumptive sanction. Cf. *Matter of Finn*, 433 Mass. 418, 425 (2001) ("The passage of time [alone] is not an appropriate factor in mitigation because many violations otherwise would go unvindicated, a result contrary to the best interests of the legal profession").[8] Prejudice to the respondent from bar counsel's delay in filing a

---

[8]The respondent points to decisions of other States where prosecutorial delay has been considered a mitigating factor in bar discipline cases. In only one case, *Hayes* v. *Alabama State Bar*, 719 So. 2d 787, 790-791 (Ala. 1998), did an unexplained prosecutorial delay lead to the dismissal of disciplinary charges. In that case, however, the Alabama disciplinary rule itself required a

petition for discipline is particularly unsupported in this case because the respondent held in her own hands the means to bring the matter to a speedy conclusion, had she chosen to do so. When first questioned by bar counsel in 1994, had she held the belief that her withdrawals from the Raposa escrow account had been legitimate, she should not have misled bar counsel into concluding that the funds were secure by intentionally submitting false documents to bar counsel. For the ensuing four years, the respondent then did nothing, presumably hoping that her withdrawals from the account would not be discovered. During that time she made no effort to return any funds to the account. She did so only when bar counsel first discovered, in 1998, that she had in fact withdrawn money from the savings account.

The respondent's conduct after 1998, when she finally made restitution on the advice of counsel, is equally revealing: either she or her counsel could readily have inquired whether the matter had been resolved to bar counsel's satisfaction. The respondent obviously chose not to do so, inferentially concluding that for her, the better course was to stay silent in the matter. We are most skeptical of her claim of prejudice, namely that she suffered emotional stress and the loss of job-related opportunities, because the record is devoid of any attempt by the respondent to inquire about the status of the matter or to reach any resolution with bar counsel. Any financial or other personal consequences she suffered were the result of her own conduct.[9]

The respondent claims that, had this case been prosecuted in

---

bar counsel to demonstrate "good cause" for any delay, and bar counsel failed to do so. *Id.* The other cases relied on by the respondent are consistent with our jurisprudence that only prejudicial delay warrants mitigation of a sanction. See, e.g., *Matter of Siegel,* 708 N.E.2d 869, 871 (Ind. 1999) (noting "mere delay does not preclude disciplinary action" and "generally, there must be some showing of clear and specific prejudice"); *Overseers of the Bar* v. *Dineen,* 557 A.2d 610, 613 (Me. 1989) (denying motion to dismiss under laches theory where no prejudice demonstrated); *Matter of Dvorak,* 580 N.W.2d 586, 592 (N.D. 1998) (refusing to dismiss or reduce sanction unless respondent demonstrated that delay resulted in "grave injustice or that the purpose of protecting the public would not be served" by imposing discipline).

[9]The respondent cites no authority for her suggestion that we expand the concept of "public opprobrium" to encompass claimed personal consequences. We decline in this case to expand the "public opprobrium" standard set forth in *Matter of Gross,* 435 Mass. 445, 451-452 (2001), to encompass nonpublic

a timely manner, the then-presumptive sanction for the violations found by the hearing committee would have been no more than a six-month suspension from the practice of law. See *Matter of Alter*, 389 Mass. 153, 156 (1983). As the single justice noted, however, the presumptive sanction of an indefinite suspension for the intentional misappropriation of client funds, with intent to deprive or actual deprivation, has been "standard" since 1984, *Matter of Schoepfer*, 426 Mass. 183, 187 (1997); *Matter of the Discipline of an Attorney*, 392 Mass. 827, 836-837 (1984) (*Three Attorneys*). At the time she made the improper withdrawals and falsified the passbook, the respondent is presumed to have known the requisite standard of conduct articulated in the *Three Attorneys* case, as well as the penalties that such actions would incur. We recognize, as did the single justice, that some of our earlier opinions did impose more modest sanctions for an attorney's misuse of client funds. As we acknowledged in *Matter of Schoepfer*, *supra* at 187, however, those cases are inconsistent with the indefinite suspension standard of *Three Attorneys*, *supra*.[10]

6. *Conclusion.* The board noted that it is "essential" that the bar and the public perceive the process of the discipline of an attorney as "fair, orderly and rational," and that "[i]mplicit in this perception is the timely and efficient resolution of complaints." We could not agree more strongly. There is no excuse for the delay in this case. However, the respondent did not demonstrate to the satisfaction of this court that she had sustained her burden of establishing that the delay met the "substantially prejudicial" standard we articulated in *Matter of Gross*, *supra* at 451. For that reason we impose the presumptive sanction for her misconduct.[11]

We acknowledge and welcome the representations of bar

adverse impacts on an attorney's professional or personal life caused by a delay in the prosecution of a grievance.

[10]The respondent argues that the delay in prosecution violated her due process rights under the United States Constitution and Massachusetts Declaration of Rights. We have considered and now reject her claim for essentially the same reasons that we explained in *Matter of Cobb*, 445 Mass. 452, 476 (2005).

[11]The respondent argues that a lengthy period of suspension can have no conceivable deterrent effect on an attorney or ameliorative benefit for the client given that the underlying conduct occurred more than one decade ago. But

counsel that new procedures are being implemented to avoid delay in the future. We expect that bar counsel will take all possible steps to ensure that we are not again confronted with a record such as the one in this case.

The order of the single justice is affirmed.

*So ordered.*

---

these are not the only reasons for imposing disciplinary sanctions for attorney misconduct. Nor does the fact that the sum of money involved is relatively small or that the respondent is unlikely to repeat the conduct render an indefinite suspension improper. See, e.g., *Matter of Pike*, 408 Mass. 740, 744-745 (1990) (likelihood of recidivism not considered as factor in determining sanction); *Matter of Gonick*, 15 Mass. Att'y Discipline Rep. 230 (1999) (indefinite suspension for single conversion of $1,600).